# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
### No. 17-989V
### Filed: January 8, 2025

| | |
|---|---|
| JASON QUIRINO,<br><br>     Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>     Respondent. | Special Master Horner |

*Andrew Donald Downing*, Downing, Allison & Jorgenson, Phoenix, AZ, for petitioner.
*Mitchell Jones*, U.S. Department of Justice, Washington, DC, for respondent.

### DECISION AWARDING DAMAGES[1]

On July 21, 2017, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that he suffered "a rheumatologic injury" as a result of Hepatitis B ("Hep B") and Tetanus-Diphtheria-acellular-Pertussis ("Tdap") vaccinations that he received on July 28, 2014. (ECF No. 1; ECF No. 35.) Petitioner later amended his petition to allege he suffered from isolated small fiber neuropathy, an atypical form of Guillain-Barré Syndrome ("GBS"). (ECF No. 53.) In December of 2023, I issued a Ruling on Entitlement finding petitioner entitled to compensation. (ECF No. 96; *see also* No. 17-989V, 2023 WL 9229145 (Fed. Cl. Spec. Mstr. Dec. 18, 2023).) For the reasons discussed below, I now conclude petitioner is entitled to an award of $130,000.00 in compensation for actual pain and suffering.

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

1

### I.    Procedural History

After the Ruling on Entitlement[3] was issued in this case, petitioner presented a demand for damages to respondent on January 16, 2024. (ECF No. 99.) Respondent did not present a counteroffer until about nine months later, on September 13, 2024. (ECF No. 106.) At that time, petitioner reported that the parties were likely too far apart in their valuation of damages to resolve the case informally, especially given the delay in receiving respondent's counteroffer. (*Id.*) Petitioner requested the undersigned resolve damages based on the parties' briefing. (*Id.*) Accordingly, the parties were directed to submit briefing on the appropriate amount of damages. Petitioner filed a brief on damages on October 1, 2024. (ECF No. 107.) Respondent filed a response on November 7, 2024. (ECF No. 109.) Petitioner then filed a reply on November 21, 2024. (ECF No. 110.) This matter is now ripe for resolution.

### II.   Factual History

#### a. Medical records[4]

On July 28, 2014, at an annual appointment with his primary care physician, Dr. Judy Kim-Hwang, petitioner received the vaccines at issue in this case. (Ex. 1; Ex. 2, p. 15.) The day after receiving the vaccines, petitioner messaged his primary care physician and reported that he developed flu-like symptoms, including fever, headache, and muscle and joint aches, about eighteen hours after receiving his vaccinations. (Ex. 7, p. 3.) On July 31, 2014, petitioner called Dr. Kim-Hwang to report numbness in his bilateral hands and above the wrist. (Ex. 6, p. 2.) The next day, on August 1, 2014, petitioner reported "numbness/dull sensation" over his left neck area. (*Id.* at 3.) That same day, petitioner had a follow up appointment with Dr. Kim-Hwang, during which he reported that one day after receiving the vaccines at issue in this case, he developed a fever, malaise/myalgias, fatigue, and numbness/tingling in his left upper extremities and on the side of his neck. (Ex. 2, pp. 16-17.) At the time of the appointment, his fever and myalgias had subsided; however, the numbness and tingling had continued intermittently in his upper extremities and feet. (*Id.*) Petitioner's neurological exam was normal. (*Id.* at 18.)

Petitioner saw neurologist Dr. Jeremy Cholfin on August 4, 2014, and elaborated on his symptoms. (Ex. 2, p. 20.) He described a hot, itchy, and "pins and needles" sensation in his hands and feet. (*Id.*) It was noted that he had "normal sensations" and "more of a subjective sense of numbness," but "[n]o frank numbness." (*Id.*) His neurological exam was normal, and he was prescribed gabapentin. (*Id.* at 22-23, 25.) Dr. Cholfin opined that petitioner was suffering from a "mild vaccine reaction with subjective parathesias/numbness," but there were no signs of GBS or multiple sclerosis. (*Id.* at 25.) Petitioner called Dr. Kim-Hwang's office on August 6, 2014, and reported

---

[3] The procedural history leading to the Ruling on Entitlement is included within that ruling.

[4] The medical records summarized here focus on those records relevant to the determination of damages. A more detailed summary of the medical records is included in the Ruling on Entitlement.

2

that his intermittent numbness had continued. (Ex. 6, p. 3.) Petitioner requested an additional appointment and an MRI. (*Id.*) Petitioner presented to Dr. Kim-Hwang later on August 6, 2014, and described his consultation with Dr. Cholfin two days earlier. (*Id.* at 26.) Petitioner's labs at this visit were normal. (*Id.* at 160-66.)

Petitioner had a follow up appointment with Dr. Cholfin on August 12, 2014, during which he reported general fatigue and numbness/tingling in his bilateral fingers and toes, as well as in his lips, tongue, and neck. (Ex. 2, p. 31.) Dr. Cholfin ordered MRIs of the brain and cervical spine, which petitioner underwent on August 21, 2014. (*Id.* at 34, 37-38, 228-29.) The MRIs revealed no abnormal enhancement. (*Id.* at 37-38, 229.) Petitioner had his next follow up appointment with Dr. Cholfin on August 25, 2014; however, he still reported a numbness, tightness, and "deadening feeling" in his arms, hands, and feet. (*Id.* at 35.) Additionally, he described a burning sensation, but noted that it has decreased. (*Id.*) Petitioner also reported taking gabapentin. (*Id.*) Petitioner's bloodwork revealed he was ANA positive. (*Id.* at 172.)

On September 4, 2014, petitioner underwent a nerve conduction study and had a follow up appointment with Dr. Cholfin. (Ex. 2, pp. 39, 267.) He reported that his symptoms remained the same and that he was still experiencing significant numbness in his fingers and feet. (*Id.* at 39-40.) He explained that he had taken gabapentin twice, but felt sleepy and did not feel like he needed it. (*Id.*) Petitioner's neurological exam revealed a subjective decrease in sensation in his bilateral fingers and toes. (*Id.* at 43.) Dr. Cholfin noted that petitioner's condition was "stable to slightly improved." (*Id.*) Dr. Cholfin also noted that there was no evidence of medium to large fiber neuropathy on petitioner's nerve conduction study. (*Id.*)

Petitioner began seeing rheumatologist Geraldine Navarro, M.D., on September 15, 2014. (Ex. 2, p. 44.) Petitioner reported that, within 24 hours after receiving the vaccines at issue in this case, he developed chills and a fever. (*Id.* at 45.) Additionally, he reported that he developed numbness and tingling in his extremities and the left side of his neck at about the same time. (*Id.*) Petitioner noted that he still felt constant tightness and tingling "over his hand and feet." (*Id.*) Petitioner also explained that he developed a feeling like he was "coming off anesthetics" in his neck, lips, mouth, and tongue. (*Id.*) Given petitioner's positive ANA and unexplained paresthesia, Dr. Navarro ordered a further workup. (*Id.* at 49.) Petitioner had a follow up appointment with Dr. Navarro on September 22, 2014. (*Id.* at 50.) He reported continued numbness and tingling in his fingers and toes; however, the burning sensation in his feet had resolved. (*Id.* at 53.) Dr. Navarro noted that petitioner's ANA was positive, but his workup was otherwise unremarkable. (*Id.*) On October 17, 2014, petitioner underwent an MRI of the pelvis to evaluate for sacroiliitis, which revealed "mild discogenic disease of the lower lumbar spine." (*Id.* at 231.)

Petitioner was seen at urgent care for an unrelated sore throat on November 24, 2014. (Ex. 2, p. 54.) Petitioner had a follow up with neurologist, Dr. Cholfin, on December 5, 2014. (*Id.* at 58.) Petitioner reported continued numbness in his forearm, hand, lips, tongue, and jaw area. (*Id.*) Additionally, he reported "heat in [his]

3

hands/feet" every evening.  (*Id.*)  Dr. Cholfin noted that petitioner's vaccine injury was "stable to slightly improved."  (*Id.* at 62.)  Dr. Cholfin reiterated that petitioner's EMG revealed no evidence of medium or large fiber neuropathy, that petitioner's ANA was slightly positive, and his C3 was mildly low.  (*Id.*)  Dr. Cholfin recommended that petitioner undergo a glucose tolerance test "to rule out hyperglycemic component," encouraged petitioner to "exercise and [perform] dexterous activities such as guitar playing," and prescribed both magnesium oxide for petitioner's paresthesias/tremors and gabapentin as needed for neuropathic pain.  (*Id.*)  Petitioner was seen for an unrelated cough on December 26, 2014.  (*Id.* at 63.)

Petitioner was seen twice in May of 2015 for unrelated conditions.  (Ex. 2, pp. 67-72.)  In January of 2016, petitioner began seeking treatment for back and shoulder pain.  (*Id.* at 72-75.)  At his appointment on January 27, 2016 for back and shoulder pain, petitioner reported a hotness and a "pins and needles" sensation in his hands and feet.  (*Id.* at 76.)  He began physical therapy in February 2016 to treat his back and shoulder pain.  (Ex. 4, pp. 29-32.)  He continued to seek this treatment through March of 2016.  (*Id.* at 13-28.)  Petitioner was next seen on April 4, 2016 for an unrelated issue.  (Ex. 2, p. 80.)  During this appointment, petitioner continued to report a "pins and needles" sensation in his hands and feet due to neuropathy.  (*Id.* at 81.)

Petitioner had an annual exam on June 14, 2016, during which he again reported a "pins and needles" sensation.  (Ex. 2, p. 85.)  On December 20, 2016, petitioner had an appointment for fatigue, rhinorrhea, cough, and an earache, during which his neuropathy was not noted.  (*Id.* at 92.)  Petitioner was seen again for the same cough on December 26, 2016, and again on January 17, 2017.  (*Id.* at 95-101.)  Petitioner's neuropathy was not mentioned during either of these appointments.  (*Id.*)  Petitioner began seeing pulmonologist Malcolm Smith, M.D., on February 16, 2017, for his chronic cough.  (*Id.* at 101.)  He did not report his neuropathy at this appointment.  (*Id.* at 101-05.)  He continued to see Dr. Smith throughout the rest of 2017.  (*Id.* at 110-18, 125-34; Ex. 12, pp. 22-26.)

On June 19, 2017, petitioner had an annual exam, during which he reported that he continued to experience hotness and a "pins and needles" sensation in his hands and feet sometimes; however, "most days [he] doesn't feel anything."  (Ex. 2, p. 119.)  In August, petitioner hurt his knee and was diagnosed with a posterior medial meniscus tear, for which he underwent physical therapy until December 2017.  (*Id.* at 134-38, 234-36; Ex. 4, pp. 1-11; Ex. 12, pp. 11-14.)  After December 2017, petitioner had two more follow ups for his knee pain, one on February 26, 2018, and the final one on May 9, 2018.  (Ex. 12, pp. 38-42, 136-40.)  In September of 2017, petitioner began experiencing an irregular heartbeat.  (Ex. 7, p. 75.)  Testing revealed no abnormalities.  (Ex. 12, pp. 81-128.)  No additional medical records were filed in this case.

### b. Testimony

Petitioner provided two affidavits and testified at an entitlement hearing in this case in which he recounted his condition and the impact it has had on his life.  (Exs. 5,

4

8; Transcript of Proceedings ("Tr."), at ECF No. 90.)  Petitioner testified that, before receiving the vaccines at issue in this case, he had no significant health problems.  (Ex. 5, ¶ 3.)  He testified that, within 24 hours after receiving the vaccines at issue in this case, he developed flu-like symptoms.  (Ex. 8, ¶ 2; Tr. 18-20.)  He also experienced "tingling and stinging sensations in [his] hands, arms, legs, feet, upper chest, neck and face," and "itching on the sides of [his] feet, as well as burning sensations in [his] feet and hands."  (Ex. 5, ¶ 7.)  Additionally, petitioner experienced fatigue, joint soreness, and dry eyes and mouth.  (*Id.*)

Petitioner testified that he is still experiencing symptoms to this day.  (Ex. 5, ¶ 11; Ex. 8, ¶ 4.)  Specifically, petitioner noted that he still experiences numbness and stinging in his "hands, arms, feet, legs, upper chest, neck and face," and "extreme and uncomfortable warmth in [his] hands and feet, especially when [he] tr[ies] to sleep."  (Ex. 5, ¶ 11.)  Additionally, petitioner testified that his fatigue also continues to this day.  (Tr. 35-36.)  Petitioner acknowledged that between December 5, 2014, and January 6, 2016, he sought treatment for various other conditions and did not mention his continued symptoms; however, he explained that, during these appointments, he was there for different conditions and, given that his other doctors had failed to explain his condition, he did not find it a pressing to mention these symptoms again.  (Tr. 45-46, 49.)  He explained that he felt like he just needed to cope with his symptoms and that this was his new normal.  (*Id.* at 49-50.)

Petitioner explained that his symptoms have had a substantial impact on his life and have limited his ability to participate in certain activities.  (Ex. 5, ¶ 10; Tr. 9-10.)  Specifically, he notes that the use of his hands has been limited.  (Ex. 8, ¶ 5; Tr. 37-38.)  Additionally, the feeling in his feet has limited his ability to hike and jog.  (Ex. 8, ¶ 6.)  Petitioner also explained that he continues to experience increased fatigue.  (*Id.* ¶ 8.)  Petitioner's other symptoms have subsided.  (*Id.* ¶ 9.)  Further, petitioner described the significant mental toll this injury has taken.  (*Id.* ¶ 11.)

### III.   Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000."  § 300aa-15(a)(4).  Additionally, a petitioner may recover for unreimbursable expenses and loss of earning capacity.  § 300aa-15(a)(1), (3).  In this case, however, petitioner requests only compensation for his pain and suffering.  (ECF Nos. 107, 110.)  The petitioner bears the burden of proof with respect to each element of compensation requested.  *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress.  *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (reasoning that "[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-

172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) (concluding that "the assessment of pain and suffering is inherently a subjective evaluation").  In general, factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.  *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Human Servs.*, No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may also consider prior awards when determining what constitutes an appropriate award of damages.  *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"); *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (explaining that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).  However, while potentially persuasive, decisions regarding prior awards are not binding.  *See Nance v. Sec'y of Health & Human* Servs., No. 06-0730V, 2010 WL 3291896, at *8 (Fed. Cl. Spec. Mstr. July 30, 2010); *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998) ("Special masters are neither bound by their own decisions nor by cases from the Court of Federal Claims, except, of course, in the same case on remand."), *aff'd*, 191 F.3d 1344 (Fed. Cir. 1999).

### IV. Party Contentions

#### a. Petitioner's motion

Petitioner requests $175,000.00 for past and ongoing pain and suffering.  (ECF No. 107, p. 11.)  Petitioner explains that his pain and suffering has been significant and continues to this day.  (*Id.*)  He encourages the court to "consider the nature of the neurological injury coupled with the length of time the injury has persisted."  (*Id.* at 12.)  Additionally, petitioner encourages the court to "consider the procedural history of this case, the delay in getting compensation to [petitioner], the severity of [petitioner's] injuries, and the fact that his injuries have persisted much longer than the stated comparables in arriving at a damages number in this case."  (*Id.* at 13.)  Petitioner cites the following decisions as reflecting comparable facts: *Coons v. Sec'y of Health & Human Servs.*, No. 20-1067V, 2024 WL 4764001 (Fed. Cl. Spec. Mstr. Oct. 16, 2024) (awarding $130,000.00 for pain and suffering based on a proffer)[5]; *E.M. v. Sec'y of Health & Human Servs.*, No. 14-753V, 2024 WL 844238 (Fed. Cl. Spec. Mstr. Feb. 13, 2024) (awarding $225,000.00 for pain and suffering based on a proffer); *Drobbin v. Sec'y of Health & Human Servs.*, No. 14-225V, 2023 WL 112268 (Fed. Cl. Spec. Mstr. Jan. 5, 2023) (awarding $250,000.00 for pain and suffering based on a proffer); *Dearing v. Sec'y of Health & Human Servs.*, No. 14-289V, 2016 WL 3030148 (Fed. Cl. Spec. Mstr. Mar. 11, 2016) (awarding $135,000.00 based on a stipulation); *Rodrigues v. Sec'y*

---

[5] In his brief, petitioner misstates the amount awarded for pain and suffering in *Coons* as $135,000.00.  (ECF No. 107, p. 12.)  The correct amount is $130,000.00.

6

*of Health & Human Servs.*, No. 21-1785V, 2024 WL 1434356 (Fed. Cl. Spec. Mstr. Mar. 5, 2024) (awarding $150,000.00 based on a stipulation).

### b. Respondent's response

Respondent proposes an award of $57,500.00 "as fair and reasonable compensation for petitioner's pain and suffering." (ECF No. 109, p. 12.) He argues that petitioner's condition was "mild and limited." (*Id.*) He explains that petitioner underwent a "de-minimis course of care," over a five-month period that included one course of prescription medication. (*Id.* at 13.) During this time, petitioner was able to maintain an active lifestyle. (*Id.*)

Respondent contends that the awards cited by petitioner are distinguishable from the current case. (ECF No. 109, pp. 13-14.) Specifically, respondent notes that the petitioners in *Coons*, *E.M.*, and *Drobbin* suffered from the residual effects of their condition for much longer and endured more extensive treatment than petitioner. (*Id.* (citing *Coons v. Sec'y of Health & Human Servs.*, No. 20-1067V, 2024 WL 1741619 (Fed. Cl. Spec. Mstr. Mar. 29, 2024); *E.M.*, 2024 WL 844238; *Drobbin*, 2023 WL 112268).) Additionally, respondent notes that *Dearing* and *Rodrigues* were procedurally distinct because they involved settlements.[6] (*Id.* at 14 (citing *Dearing*, 2016 WL 3030148; *Rodrigues*, 2024 WL 1434356).) Respondent argues that "comparable cases

---

[6] Neither party has cited any prior reasoned decision by a special master addressing the appropriate amount of compensation for a small fiber neuropathy injury. Nor has the undersigned otherwise located any prior reasoned decision on point. Reasoned decisions are generally more persuasive than cases involving either stipulations or proffers. *E.g.*, *Smith v. Sec'y of Health & Human Servs.*, No. 19-0745V, 2021 WL 2652688, at *3 (Fed. Cl. Spec. Mstr. May 28, 2021) (observing that, "[w]hile 'settled cases and proffers provide some evidence of the kinds of awards received overall in comparable cases,' they are not as persuasive as reasoned decisions from a judicial neutral" (emphasis omitted)). Proffers and stipulations differ in that proffers typically are presented in cases where entitlement to compensation has been resolved and the government views the proffered amount as representing full compensation. Stipulations, by contrast, typically are presented in cases where the parties have reached a compromise based on litigative risk while significant issues remain unresolved regarding either entitlement to compensation or the appropriate amount of damages. Respondent discounts prior stipulations because they do not constitute admissions on respondent's part as to what constitutes the full value of a given claim. (ECF No. 109, n.1.) However, despite this distinction, both settlements and proffers are informal resolutions by agreement of the parties, rather than reasoned adjudications. They can therefore be influenced by factors beyond pin-pointing the appropriate amount of damages, especially in the context of stipulations but also in the context of proffered awards. (For example, a given petitioner may disagree that a proffered amount is full compensation, but opt to accept it anyway as a matter of expediency.) Thus, when utilized in determining damages, stipulations and proffers are generally better viewed in aggregate. *E.g.*, *Smith*, 2021 WL 2652688, at * 3 (using data from prior SIRVA proffers and stipulations "as a whole"). An additional issue with stipulations (and sometimes proffers) is that they may resolve damages based on a top-line number only and do not break out the different elements of damages that may be alleged. Furthermore, decisions adopting stipulations and proffers generally do not disclose the facts of the case pertinent to the amount of the damages. In some proffered cases, such as those discussed below, the facts of the case can be separately gleaned from a prior reasoned ruling on entitlement. Nonetheless, despite these limitations, and especially given the lack of available reasoned decisions on point, prior proffers and stipulations still provide some evidence of the awards given in comparable cases.

7

confirm that respondent's proffer is reasonable, fair, and appropriate." (*Id.* at 12-13.) However, respondent does not actually identify any specific case(s) that he would consider to be comparable.

### c. Petitioner's reply

Petitioner argues that his course of treatment was not mild, as respondent contends, and that he pursued active treatment for four years and, to this day, eight years after his injury, petitioner continues to experience the effects of his vaccine injury. (ECF No. 110, pp. 1-4.) Therefore, while "each case has different facts," petitioner's lasting symptoms entitle him to a "comparable amount for his pain and suffering to other cases in this [p]rogram." (*Id.* at 4.)

### V. Analysis

I have reviewed damages awards for small fiber neuropathy, including those cited by petitioner. However, I do not merely rely on analogy to any prior award to determine the amount of petitioner's damages in this case. Instead, I have reviewed previous small fiber neuropathy awards, the arguments presented by the parties, and the totality of the evidentiary record.

Petitioner alleges sensory symptoms, including pain, tingling, and numbness in his hands, feet, neck, and face. (Ex. 8, ¶ 3.) However, his medical records demonstrate that neither his strength, gait, nor reflexes were affected. (Ex. 2, pp. 16-19, 37.) Respondent cites petitioner's short active treatment timeline to draw attention to the severity of petitioner's injury, noting that petitioner was only actively treated for five months and was able to maintain an active lifestyle during that time. (ECF No. 109, p. 13.) Nonetheless, petitioner established that he has suffered an overall course of small fiber neuropathy persisting at this point for about a decade. Regarding the discontinuance of active treatment, petitioner contends that he simply felt that his doctors did not have an explanation for his condition and that his symptoms would be his new normal. (Tr. 49-50.) Given the symptoms and condition at issue, this seems reasonable.

However, petitioner is not persuasive in asserting that, despite symptom fluctuations, his abnormal sensations "are always present." (ECF No. 107, p. 8 (citing Ex. 8, ¶ 4).) In discussing his fluctuating symptoms (noting good days and bad), his medical records specifically confirm as of June 2017 that "most days [he] doesn't feel anything" vis-à-vis his reported sensations of burning, pins, and needles. (Ex. 2, p. 119.) Thus, while petitioner is credible in suggesting that his symptoms never entirely resolved, petitioner's medical records also support the conclusion that his symptoms were relatively mild for a small fiber neuropathy and became intermittent during his course of treatment. (*See also* ECF No. 107, pp. 7-8 (highlighting an assessment of "mild" peripheral neuropathy as of December 5, 2014, at Ex. 2, p. 62, and a record observing the neuropathy was "not progressive" as of January 27, 2016, at Ex. 2, p. 78).)

8

Petitioner has cited five prior cases suggesting a range of pain and suffering awards in small fiber neuropathy cases from $130,000.00 to the statutory maximum. However, petitioner does not explicitly address the facts of any of these other cases. (ECF Nos. 107, 110.)  Instead, petitioner simply represents the listed cases to be a non-comprehensive list of prior small fiber neuropathy awards and contends that "the time frame that [petitioner]'s complaints have persisted is greater than any of these cases, and the complaints are permanent.  This warrants a higher amount for pain and suffering."  (ECF No. 107, p. 12.)  Nonetheless, respondent has not identified any damages awards as comparable and has not substantiated the specific award he seeks for this case.  *See Smith*, 2021 WL 2652688, at *3 (Chief Special Master cautioning respondent with respect to an award of pain and suffering that "[i]n arguing for a lower pain and suffering figure herein, Respondent cited no prior reasoned decisions from the Vaccine Program.  During the proceeding held during the expedited Motions Day in this case, I reminded Respondent's counsel that if Respondent wants to prevail in future cases, it is crucial that he offer comparable awards to support the argued for amount(s).").[7]

In *Coons*, wherein the petitioner received $130,000.00 for pain and suffering, the petitioner suffered numbness, tingling, and burning sensations like this petitioner, but her condition was severe enough to result in difficulty walking and progressed throughout her treatment history, ultimately interfering with her ability to work.[8]  2024 WL 1741619, at *3-6.  The *Coons* ruling on entitlement reviewed medical records for a treatment history spanning about eleven months.  *Id.*  There is no indication within the *Coons* ruling that petitioner ever saw any improvement in her symptoms.  The decision awarding damages was issued more than five years after the onset of the injury.  *Coons*, 2024 WL 4764001.  Respondent argues that the *Coons* petitioner suffered a more severe course of small fiber neuropathy because she was hospitalized, treated with several prescriptions including amitriptyline, gabapentin, a Medrol dosepak, and Keppra, and received consistent treatment for four years.  (ECF No. 109, p. 13.)  In reply, petitioner contends, based on counsel's familiarity with the case, that the *Coons*

---

[7] Petitioner's brief does acknowledge that his list of cited cases is "non-inclusive."  (ECF No. 107, p. 12.)  However, it is also worth noting that the undersigned's own review of prior awards confirms that petitioner has not identified a floor for small fiber neuropathy awards.  *See, e.g.*, *Fiske v. Sec'y of Health & Human Servs.*, No. 17-1378V, 2024 WL 4930687 (Fed. Cl. Spec. Mstr. May 21, 2024) (awarding $92,500.00 for pain and suffering).  Nonetheless, as noted in note 6, *supra*, prior awards based on stipulations and proffers are better viewed in aggregate.  Accordingly, especially in the absence of any effort by respondent to identify any comparable cases, the undersigned will not endeavor to cherry-pick any specific prior awards as additional points of comparison given that no prior reasoned decisions are available.

[8] The fact that an injury is severe or pervasive enough to interfere with employment can be a factor in determining an award for pain and suffering separate and apart from an award of loss of earnings.  *E.g. Hood v. Sec'y of Health & Human Servs.*, No.1601942V, 2021 WL 5755324, at *8-9 (Fed. Cl. Spec. Mstr. Oct. 19, 2021) (considering the fact that a petitioner's GBS interfered with his ability to work as evidence going to the severity of the petitioner's condition, as considered in determining an award for pain and suffering).

9

petitioner's small fiber neuropathy was not more severe than this petitioner's. However, this assertion is not explained.[9]  (ECF No. 110, pp. 3-4.)

In *E.M.*, the petitioner was compensated $225,000.00 for over twelve years of pain and suffering. 2024 WL 844238.[10]  The *E.M.* petitioner suffered small fiber neuropathy beginning in August of 2011. The condition generally stabilized during 2012, but remained ongoing and did include some "bad" flares thereafter. *E.M. v. Sec'y of Health & Human Servs.*, No. 14-753V, 2024 WL 10509841, at *3-6 (Fed. Cl. Spec. Mstr. Dec. 27, 2023). Generally, petitioner's ongoing symptoms included foot, trunk, and arm pain made worse with activity, as well as a burning sensation, increased body temperature (petitioner's small fiber neuropathy included mild autonomic neuropathy), and an inability to exercise. *Id.* Nerve conduction studies had been normal, but it was later determined that petitioner had evidence of ganglionopathy. *Id.* Respondent argues that the *E.M.* petitioner's case was diagnostically more complex and significantly impacted her career. (ECF No. 109, p. 14.) However, although the *E.M.* petitioner's treating physician had concluded that pain medication was ineffective and therefore discussed with petitioner the need to rest and cut back on stressful work, the loss of earnings capacity claim was ultimately rejected. 2024 WL 10509841, at 7, 22. Moreover, the special maser specifically rejected the contention that the petitioner's broader, more complicated presentation was related to her small fiber neuropathy. *Id.* at 20 (finding that symptoms of headache, eye pain, and blurred vision, were due to an unrelated neuralgia). Nonetheless, the petitioner had testified that her symptoms remained "severe" and were further aggravated by stress or fatigue. *E.M. v. Sec'y of Health & Human Servs.*, No. 14-753V, 2021 WL 3477837, at *12 (Fed. Cl. Spec. Mstr. July 9, 2021). As noted above, petitioner did not explicitly address the facts of the *E.M.* case.

The remainder of the cases cited by petitioner are less helpful. While taking some limited notice of the fact of the stipulated awards in both *Dearing* and *Rodrigues*, no publicly disclosed facts regarding the course of the alleged small fiber neuropathy are available for comparison. *Dearing*, 2016 WL 3030148 (awarding $135,000.00); *Rodrigues*, 2024 WL 1434356 (awarding $150,000.00). Neither party has attempted to discuss the facts of either case. Notably, while the *Rodrigues* petitioner received a higher award as compared to *Dearing* ($150,000.00 versus $135,000.00), the *Rodrigues* petitioner had alleged bullous pemphigoid in addition to small fiber

---

[9] As noted above, the ruling on entitlement in *Coons* only discusses medical records spanning approximately eleven months. 2024 WL 1741619, at *3-6. Accordingly, respondent's specific assertion of a four-year treatment history cannot be confirmed based on the publicly available rulings and decisions in the case. However, petitioner's reply stresses that petitioner's counsel was also counsel of record in *Coons*, and petitioner's reply does not dispute this assertion by respondent. (ECF No. 110, pp. 3-4.)

[10] In addition to a decision awarding damages based on proffer, which is not factually informative, the *E.M.* case also had a prior Ruling on Entitlement (No. 14-753V, 2021 WL 3477837 (Fed. Cl. Spec. Mstr. July 9, 2021)) that discussed the facts of the case as relevant to determining entitlement to compensation as well as a separate Ruling on Petitioner's Lost Earnings Claim (No. 14-753V, 2023 WL 10509841 (Fed. Cl. Spec. Mstr. Dec. 27, 2023)) that further discussed the medical facts, identified additional evidence developed during the damages phase, and adjudicated certain factual aspects of the case.

neuropathy. 2024 WL 1434356.[11] The *Drobbin* case, though not involving a stipulation, is also less helpful because the scope of the award for pain and suffering is not entirely clear. The *Drobbin* petitioner was awarded $250,000.00 for pain and suffering, as well as a significant amount for loss of earnings. 2023 WL 112268. Thus, respondent stresses that the petitioner's overall compensated condition was severe enough to interfere with his employment. (ECF No. 109, p. 14.) However, *Drobbin* had alleged not only small fiber neuropathy, but also a neuromuscular junction disorder and motor polyneuropathy. 2023 WL 112268. In particular, during the course of the case, petitioner sought to establish that he suffered a vaccine-caused mononeuritis multiplex. *Drobbin v. Sec'y of Health & Human Servs.*, No. 14-225V, 2020 WL 3799206, at *16 (Fed. Cl. Spec. Mstr. Jan. 21, 2020). Thus, even respondent's expert, though disagreeing with petitioner's specific contentions, agreed that petitioner had a broader constellation of symptoms beyond his confirmed small fiber neuropathy that were difficult to classify. *Id.* at *11-14. Ultimately, in ruling that petitioner was entitled to compensation, the special master found that petitioner had only demonstrated that he suffered vaccine-caused small fiber neuropathy, specifically noting that petitioner had not demonstrated causation as it related to mononeuritis multiplex. *Id.* at *17. Yet, in separately resolving petitioner's diagnosis, the special master also specifically concluded that there was not preponderant evidence that petitioner suffered any condition other than small fiber neuropathy. *Id.* at *16. Thus, while the *Drobbin* petitioner's overall clinical course was much more severe than this petitioner, it is unclear what specific aspects of petitioner's clinical history the parties considered when informally resolving damages.

For the reasons discussed above, petitioner is not persuasive in contending that his condition warrants *higher* compensation as compared to any of the other cases he has cited. Neither party actually grappled with the facts of any of the cited cases in any meaningful way. Yet, based on the undersigned's own review, petitioner's own case is distinguishable from those prior cases. Petitioner, of course, bears the burden of proof with respect to the damages he requests. *Brewer*, 1996 WL 147722, at *22-23. However, even having concluded that petitioner's injury was mild *for a small fiber neuropathy*, a longstanding history of peripheral neuropathy is still a significant injury. Thus, especially in light of respondent's failure to meaningfully substantiate a lower award, the undersigned finds that $130,000.00 represents a reasonable award of compensation for petitioner's pain and suffering. On the whole, while this case saw less severe symptoms than the *Coons* case, the overall history supports a longer duration of

---

[11] Notably, *Rodrigues* was on the undersigned's own docket and it was the undersigned that issued the decision awarding damages. However, bringing the undersigned's own background knowledge to bear within this decision would be problematic. Explicitly discussing previously undisclosed facts of the *Rodrigues* case would violate the *Rodrigues* petitioner's right under the Vaccine Act to seek redaction of private medical information. However, relying on facts from the *Rodrigues* case without explicitly disclosing them would risk prejudice to the parties. *See Davis v. Sec'y of Health & Human Servs.*, 94 Fed. Cl. 53, 65-66 (2010) (indicating that a special master must "provide adequate notice to the parties of evidentiary issues and matters" to be decided). Accordingly, nothing beyond the four corners of the decision awarding damages in the *Rodrigues* case is considered herein.

injury than was adjudicated in *Coons*. Absent a more robust defense of a lower proposed award, the undersigned will not parse these factual differences.

## VI.    Conclusion

In light of the above, **I award petitioner a lump sum payment of $130,000.00 for actual pain and suffering to be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt distribution**. This amount represents compensation for all damages available under § 300aa-15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[12]

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master

---

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.